**Robin M. WILSON–JONES, et al.,**
**Plaintiffs–Appellees/Cross–**
**Appellants,**

v.

**Rev. E. Theophilus CAVINESS, et al.,**
**Defendants–Appellants/Cross–**
**Appellees.**

Nos. 95–3086, 95–3143.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 8, 1996.
Decided. Oct. 30, 1996.

Linda Kathryn Fiely (briefed), Ohio Civil Service Employees Association, Columbus, OH, Michael A. Moses (argued and briefed), Columbus, OH, for Plaintiffs–Appellees/Cross–Appellants.

Linda Kathryn Fiely, Ohio Civil Service Employees Association, Columbus, OH, Christa D. Thompson, Bexley, OH, Michael A. Moses, Columbus, OH, for Debra K. Payne in No. 95–3086.

Robert L. Griffin, Asst. Attorney Gen. (argued and briefed), Columbus, OH, for Defendants–Appellants/Cross–Appellees.

Before: BOGGS and NORRIS, Circuit Judges; and HOOD,\* District Judge.

BOGGS, Circuit Judge.

The plaintiffs in this action seek money damages from the Ohio Civil Rights Commission ("Commission") for violation of the Fair Labor Standards Act ("FLSA"). In light of *Seminole Tribe of Florida v. Florida,* —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), we hold that the part of the FLSA that purports to give federal courts jurisdiction over an action against a state for viola-

---

\* The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

tion of the FLSA's minimum wage and maximum hour provisions is unconstitutional and, therefore, the district court was without jurisdiction over the plaintiffs' case.

## I

Plaintiffs are employees of the Ohio Civil Rights Commission who believe that the Commission violated the overtime provisions of the FLSA. The district court awarded the plaintiffs money damages, and the defendants filed a timely notice of appeal. After *Seminole Tribe* was decided, we informed the parties by letter of a possible lack of subject matter jurisdiction. We asked the parties to address the implications of *Seminole Tribe* at oral argument, which they did admirably on short notice.

## II

■ A threshold question is the extent of our obligation to decide the jurisdictional issue. In *Patsy v. Board of Regents*, 457 U.S. 496, 515 n. 19, 102 S.Ct. 2557, 2567 n. 19, 73 L.Ed.2d 172 (1982), the Supreme Court noted in dicta that it had never held that the Eleventh Amendment "is jurisdictional in the sense that it must be raised and decided by this Court on its own motion." Circuit courts generally interpreted this language to mean that a federal court may or may not raise the issue of a state's immunity, in its discretion. *E.g., Biggs v. Meadows*, 66 F.3d 56, 60 (4th Cir.1995); *Baxter v. Vigo County Sch. Corp.*, 26 F.3d 728, 735 n. 5 (7th Cir. 1994).

■ We believe that *Patsy* 's permissive language is superseded by *Seminole Tribe* 's holding that "[t]he Eleventh Amendment restricts the judicial power under Article III." As an Article III restriction, state immunity is jurisdictional in the same sense as the complete diversity requirement, *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806), or the well-pleaded complaint rule, *Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908).

As with these other Article III limits, neither the litigants' consent, nor oversight, nor convenience can constitutionalize a court's exercise of illegal power.[1] *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121, 104 S.Ct. 900, 919, 79 L.Ed.2d 67 (1984) ("[a] federal court *must* examine each claim in a case to see if the court's jurisdiction over that claim is barred by the Eleventh Amendment." (emphasis added) (dicta)); *Gorka v. Sullivan*, 82 F.3d 772, 774 (7th Cir.1996) (Eleventh Amendment a jurisdictional bar, and court must dismiss case even when state defendant removed to federal court voluntarily). *Mascheroni v. Board of Regents*, 28 F.3d 1554, 1557–59 (10th Cir.1994) (discussing the conflict between the permissive dicta in *Patsy* and the mandatory dicta in *Pennhurst* ).

We are therefore required to ask whether Congress has effectively waived Ohio's Eleventh Amendment immunity.

## III

Congress passed the FLSA in 1938. It requires certain employers to pay their employees a minimum wage and also to pay them one and one-half times their regular rate of pay for hours worked in excess of 40 during one week. In its original form, the FLSA did not apply to "any State or political subdivision of a State," §§ 3(d), 13(a)(9) of the FLSA, 52 Stat. 1060, 29 U.S.C. § 203(d) (1940 ed.), and the Supreme Court unanimously upheld it as a valid exercise of Congress's commerce power. *United States v. Darby*, 312 U.S. 100, 115, 61 S.Ct. 451, 457, 85 L.Ed. 609 (1941).

Congress began to expand the FLSA to cover the states' relationship with their employees in the 1960s. In 1961, Congress included state-run "enterprises" engaged in commerce or the production of goods for commerce in the Act's definition of "employer." 75 Stat. 65, 29 U.S.C. §§ 203(r) & (s), 206(b), 207(a)(2) (1964 ed.). In 1966, Congress included state-owned schools, hospitals, nursing homes, and mental institutions. 80

1. A state, of course, may consent to waive its Eleventh Amendment immunity, but this usually occurs only by explicit language in state legislation. Ohio, for example, allows for the waiver of

sovereign immunity only by its legislature, not by an attorney in a particular action. *Krause v. Ohio*, 31 Ohio St.2d 132, 285 N.E.2d 736 (1972).

Stat. 831, 832, 29 U.S.C. §§ 203(d), 203(s)(4) (1964 ed., Supp. II). The Supreme Court held that both of these amendments were within Congress's power under the Commerce Clause. *Maryland v. Wirtz*, 392 U.S. 183, 188, 88 S.Ct. 2017, 2019, 20 L.Ed.2d 1020 (1968).

In 1973, the Supreme Court squarely faced for the first time the question of whether the FLSA abrogated—or "waived"—the states' immunity from suit in federal court under the Eleventh Amendment. *See Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), (Eleventh Amendment protects states from suits by private citizens brought in federal court). The Court found no clear statement of a congressional intent to abrogate the states' immunity, and held that a non-consenting state could not be sued by an individual citizen under the FLSA in federal court. *Employees v. Missouri Public Health Dept.*, 411 U.S. 279, 281, 93 S.Ct. 1614, 1616, 36 L.Ed.2d 251 (1973).

In 1974, Congress amended the FLSA to add the clear statement required by the Court. The amendment, still the law today, broadened the definition of "employer" to include a "public agency," 88 Stat. 55, 29 U.S.C. § 203(d) (1978 ed.), and defined "public agency" to include "the government of a State or political subdivision thereof [or] any agency of ... a State, or a political subdivision of a State," 29 U.S.C. § 203(x) (1978 ed.). After this amendment, the Eleventh Amendment issue seemed resolved, and courts consistently denied state claims of Eleventh Amendment immunity. *E.g.*, *Spencer v. Auditor of Public Accounts*, 705 F.Supp. 340, 344–45 (E.D.Ky.1989). It was clear, then, that Congress could abrogate a state's sovereign immunity by an express statement. *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 17, 109 S.Ct. 2273, 2283, 105 L.Ed.2d 1 (1989). Litigation focused instead on the substantive provisions of the Act, rather than the jurisdictional grant, challenging the FLSA's application to the states on the ground that it interfered with vital state functions in violation of the *Tenth* Amendment. *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), *overruled by Garcia v. San Antonio*

*Metro. Transit Auth.* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985).

 *Seminole Tribe*, —— U.S. at ——, 116 S.Ct. at 1131, overruled *Pennsylvania v. Union Gas.* The power of Congress to abrogate by express statement a state's Eleventh Amendment immunity is no longer unlimited. This power depends on the particular purpose for which Congress attempts to take away the state's immunity. The regulation of interstate commerce alone cannot justify a waiver, because Congress's power to regulate interstate commerce, which is part of Congress's Article I powers, is limited by the Eleventh Amendment. *Seminole Tribe*, —— U.S. at ——, 116 S.Ct. at 1131 (Congress cannot waive limits on its Article I powers).

## IV

Neither party disputes the obvious fact that the FLSA's wage and hour provisions were enacted pursuant to Congress's commerce power. The FLSA begins:

> It is hereby declared to be the policy of this Act, through the exercise by Congress of its power to regulate commerce among the several States, to correct and as rapidly as practicable eliminate the conditions above referred to in such industries without substantially curtailing employment or earning power.

52 Stat. 1060. Nor does either party dispute that the commerce power alone is insufficient authority for Congress to abrogate state sovereign immunity. *See Seminole Tribe*, —— U.S. at ——, 116 S.Ct. at 1131. Faced with a similar case, a district court has twice held that an action for overtime compensation under the FLSA against a state cannot proceed in federal court absent the state's consent. *Blow v. State of Kansas*, 929 F.Supp. 1400 (D.Kan.1996) ("Seminole Tribe determined that Congress does not have authority under the Interstate Commerce Clause to abrogate a state's Eleventh Amendment immunity, [and] there can be no cause of action against a state or any of its agencies under the FLSA."); *Adams v. State of Kansas*, 934 F.Supp. 371 (D.Kan.1996) (same).

 Our present case is made difficult only by the contention of the plaintiffs that

the federal courts have subject matter jurisdiction over their action despite *Seminole Tribe* because the FLSA is within the power of Congress to enforce the Equal Protection Clause under § 5 of the Fourteenth Amendment. It is settled that the Eleventh Amendment does not limit the effectiveness of legislation passed pursuant to Congress's power under the Fourteenth Amendment. *Fitzpatrick v. Bitzer,* 427 U.S. 445, 453–55, 96 S.Ct. 2666, 2670–71, 49 L.Ed.2d 614 (1976). For such legislation to confer federal jurisdiction over actions against states by private individuals, therefore, all that is necessary is a sufficiently clear statement of Congress's intent to abrogate Eleventh Amendment immunity. *See generally Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 243, 105 S.Ct. 3142, 3148, 87 L.Ed.2d 171 (1985) ("Congress must express its intention to abrogate the Eleventh Amendment in unmistakable language in the statute itself").[2] The Commission does not dispute that the clear statement rule laid out in *Atascadero* is satisfied by the FLSA.

We are therefore faced with the question of whether the FLSA is within the powers given to Congress by Section 5 of the Fourteenth Amendment. There is no precedent on point. One might expect that the limit on the commerce power imposed by *National League of Cities* from 1976 to 1985 would have resulted in claims that the FLSA had another source of authority under which the substantive provisions of the act could be applied to state employers. Such claims of alternative sources of authority, however, seem to have been limited to particular amendments to the FLSA, most notably the Equal Pay Act. Courts found that this act, passed to remedy discrimination in the workplace, could be seen as legislation to enforce the Fourteenth Amendment. *Marshall v. Owensboro–Daviess County Hosp.,* 581 F.2d 116, 119–20 (6th Cir.1978) (Equal Pay Act); *Marshall v. City of Sheboygan,* 577 F.2d 1 (7th Cir.1978) (Equal Pay Act); *Usery v.*

*Charleston County Sch. Dist.,* 558 F.2d 1169 (4th Cir.1977) (Equal Pay Act); *Usery v. Allegheny County Inst. Dist.,* 544 F.2d 148 (3d Cir.1976) (Equal Pay Act), *cert. denied,* 430 U.S. 946, 97 S.Ct. 1582, 51 L.Ed.2d 793 (1977). The question whether the original core of the FLSA might be an enactment to enforce the Fourteenth Amendment has not been answered.

A source of power has been held to justify an act of Congress even if Congress did not state that it rested the act on the particular source of power. We have held that: "(i)n exercising the power of judicial review, as distinguished from the duty of statutory interpretation, we are concerned with the actual powers of the national government." *Marshall v. Owensboro–Daviess County Hosp.,* 581 F.2d at 120 (citing *Allegheny County Inst. Dist.,* 544 F.2d at 155). *See also Woods v. Cloyd W. Miller Co.,* 333 U.S. 138, 144, 68 S.Ct. 421, 424, 92 L.Ed. 596 (1948); ("the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise."); *Katzenbach v. Morgan,* 384 U.S. 641, 647 n. 5, 86 S.Ct. 1717, 1721 n. 5, 16 L.Ed.2d 828 (1966) (listing possible sources of congressional authority despite absence of mention of those sources in the statute); *Fullilove v. Klutznick,* 448 U.S. 448, 473, 100 S.Ct. 2758, 2772, 65 L.Ed.2d 902 (1980) (upholding legislation as valid exercise of Congress's enforcement clause power even though statute is unclear as to the source of power Congress intended to invoke).

In the particular context of enforcement clauses—which appear in the 13th, 14th, 15th, 18th, 19th, 23rd, 24th, and 25th amendments—an act is a valid exercise of the enforcement power if it is "rationally related" to the amendment's subject matter. *South Carolina v. Katzenbach,* 383 U.S. 301, 324, 86 S.Ct. 803, 816, 15 L.Ed.2d 769 (1966) (13th Amendment);

---

**2.** It is not necessary for Congress to actually say "we intend to abrogate Eleventh Amendment immunity," of course. The Eleventh Amendment is waived if Congress simply grants a citizen a right of action against a state in federal court without mention of a potential Eleventh Amendment problem, as long as Congress's grant of that right of action in federal court is sufficiently express to render Congress's intention "unmistakable." *E.g., Fitzpatrick,* 427 U.S. at 448 n. 2, 96 S.Ct. at 2668 n. 2 (citing as sufficient evidence of waiver clear language saying that states are subject to suit in federal court).

In regard to the Civil War amendments, the Court has held:

> Whatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power.

*Ex parte Virginia*, 100 U.S. 339, 345, 25 L.Ed. 676 (1879). And somewhat more recently, the Court refined the test for Section 5 legislation enacted to enforce the Equal Protection Clause to be whether a statute:

> [1] may be regarded as an enactment to enforce the Equal Protection Clause, [2] whether it is 'plainly adapted to that end' and [3] whether it is not prohibited by but is consistent with 'the letter and spirit of the constitution.'

*Katzenbach v. Morgan*, 384 U.S. 641, 651, 86 S.Ct. 1717, 1724, 16 L.Ed.2d 828, (1966) (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819)).

■ It is clear to us that these three *Katzenbach* factors cannot be kept so permissive as to make them collapse into the "rationally related" test generally used for the enforcement clauses of other constitutional amendments. The Fourteenth Amendment contains rather specific constitutional goals, such as the elimination of race discrimination by state actors, and also more general goals, such as the guarantee to every citizen of equal protection of the laws. The general goal of equal protection of law encompasses every facet of a citizen's interaction with government. If we were to say that an act is valid if it is rationally related to achieving equal protection of the laws, then § 5 becomes a license to Congress to pass any sort of legislation whatsoever. In reviewing such legislation, we could only ask whether the statute was a rational means to make the system of laws more rational, and the answer would always be "yes." [3]

■ On the other hand, it is equally clear that Congress has broad discretion to legislate to enforce the core promises of the Fourteenth Amendment. Specifically, the Supreme Court and our circuit have been extremely deferential when reviewing under Section 5 legislation passed to enforce the ban on race discrimination by a state, *Detroit Police Officers' Assoc. v. Young*, 608 F.2d 671, 689 n. 7 (6th Cir.1979), to prohibit ethnic and linguistic restrictions on voting, *Katzenbach*, 384 U.S. at 652, 86 S.Ct. at 1724, to remedy discriminatory practices in the hiring of public contractors, *Fullilove*, 448 U.S. at 477–78, 100 S.Ct. at 2774–75, or to remedy gender discrimination by state employers, *Marshall*, 581 F.2d at 119–20.

■ In a rough effort to interpret the Fourteenth Amendment's enforcement clause in a manner that does not give Congress carte blanche to pass any legislation rationally related to any Fourteenth Amendment end, the three requirements identified in *Katzenbach* do provide some guidance. The most important of these three requirements for valid enforcement legislation—whether the legislation is consistent with the negative constraints of the Constitution, specifically the Constitution's protection of individual rights, *Katzenbach*, 384 U.S. at 651 n. 10, 86 S.Ct. at 1724 n. 10—is not relevant to the present appeal. The other two requirements are certainly relevant, but are vague enough to make precise definition difficult.

■ We believe that the plaintiffs' arguments about the Fourteenth Amendment as a possible basis for the FLSA can be resolved by focusing on the first *Katzenbach* factor: whether one may "regard the legislation as an enactment to enforce the [amendment]." *Katzenbach*, 384 U.S. at 651, 86

---

**3.** The potential source of Congressional power becomes even broader when one considers that the Supreme Court has held that Congress can use Section 5 to enforce the parts of the Bill of Rights which the Fourteenth Amendment incorporates and applies to the states. *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). *But see Oregon v. Mitchell*, 400 U.S. 112, 127, 91 S.Ct. 260, 266, 27 L.Ed.2d 272 (1970) ("Nor was the Enforcement Clause of the Fourteenth Amendment intended to permit Congress to prohibit every discrimination between groups of people.").

S.Ct. at 1724. The simplest way to meet this requirement is for Congress to declare explicitly that the legislation is passed to enforce Fourteenth Amendment rights. Such was the case in *Katzenbach* itself, where the relevant section of legislation stated that it was enacted "to secure the rights under the fourteenth amendment...." *Katzenbach,* 384 U.S. at 652, 86 S.Ct. at 1724.

Use of the label "Fourteenth Amendment right" may not be necessary, however. See *EEOC v. Wyoming,* 460 U.S. 226, 243 n. 18, 103 S.Ct. 1054, 1064 n. 18, 75 L.Ed.2d 18 (1983) (Congress need not "recite the words 'section 5' or 'Fourteenth Amendment' "). In *Fullilove,* the Court upheld legislation under a variety of sources of congressional power, including the enforcement clause of the Fourteenth Amendment, despite the facts that the Fourteenth Amendment is nowhere mentioned in the relevant act and that Congress made no finding that a particular Fourteenth Amendment right was violated. 448 U.S. at 476, 100 S.Ct. at 2773. And in *Fitzpatrick,* the Court turned to legislative history to reconstruct the probable intent of Congress. 427 U.S. at 453 n. 9, 96 S.Ct. at 2670 n. 9.

■ However, if Congress does not explicitly identify the source of its power as the Fourteenth Amendment, there must be something about the act connecting it to recognized Fourteenth Amendment aims. Each case we could locate where legislation was upheld under the Fourteenth Amendment's enforcement clause concerned discrimination by state actors on the basis of race or gender. Our holding in *Marshall,* that the Equal Pay Act is within the scope of the Enforcement Clause, not to mention the Supreme Court's holding in *Fullilove,* means that legislation "may be regarded as enacted to enforce" the Fourteenth Amendment simply because it is obviously aimed at one of these two central evils. 581 F.2d at 199. *But see Pennhurst State Sch. and Hosp. v. Halderman,* 451 U.S. 1, 15, 101 S.Ct. 1531, 1538, 67 L.Ed.2d 694 (if Congress has not clearly expressed an intent to impose some obligation on the states the mere possibility of a Fourteenth Amendment rationale for a piece of legislation is not adequate evidence of Congress's intent).

■ Examining the FLSA itself, there is no sufficiently strong logical connection between the aim of the act—to increase the wages and shorten the hours of certain employees—and central, obvious Fourteenth Amendment concerns. The plaintiffs argue that the 1974 amendment to the FLSA extending jurisdiction to actions against states was motivated by a concern that state employees were receiving less pay than private sector employees, and cite a few instances in the legislative history suggesting a desire to end this "discrimination." However, such reasoning could support any Congressional action extending the scope of a law to cover a new class of people—thereby defeating the principle that Congress has but limited power. We think it best to "regard as an enactment to enforce" the Equal Protection Clause, in the absence of explicit comment by Congress, only efforts to remedy discrimination against a class of persons that Fourteenth Amendment jurisprudence has already identified as deserving special protection.[4] The FLSA does not fall within this special class of legislation and may not be regarded as passed to enforce the Fourteenth Amendment simply because it is aimed to remedy a mundane "discrimination" between private- and public-sector workers.

The second *Katzenbach* requirement is whether the legislation is "plainly adapted to that end," i.e., whether the means chosen by Congress fit the identified or hypothetical Fourteenth Amendment purpose. Because we hold that the FLSA cannot be regarded as serving a Fourteenth Amendment purpose to the extent required by *Katzenbach,* federal precedent, and the mandate that there be actual limits to Congress's powers, we reserve judgment on the issue of the second requirement. Development of a doctrine of a means-end fit for Fourteenth Amendment legislation should wait until a case arises

---

4. Our opinion might be different if Congress made findings that a particular group needed legal protection to remedy some sort of invidious discrimination not directly addressed by federal precedent.

where a challenged piece of legislation—either by the nature of the legislation or by Congress's express statement—can be regarded as enacted to enforce the Fourteenth Amendment.

Our resolution of this case is supported implicitly by *National League of Cities.* In that case, since overruled, the Supreme Court decided that the Tenth Amendment protects state employers from the FLSA. The Supreme Court struck the part of the FLSA that purported to regulate the workplace of state institutions and agencies. In so doing, the Supreme Court did not address the possibility that the FLSA could be supported under the Enforcement Clause of the Fourteenth Amendment. It cannot be said that the Court's silence was an oversight. The Court expressly held that its opinion did not reach the question of whether *other* legislation passed pursuant to the Commerce Clause could be upheld under the enforcement clause of the Fourteenth Amendment. (Later courts held that the Equal Pay Act was this sort of legislation.) But the court did not reserve opinion on the issue whether there were other possible sources for the FLSA *itself.* The only explanation for this failure is that the Court believed that the Fourteenth Amendment was not relevant to the question of Congress's power to enact general labor laws not aimed directly at discrimination against a specially-protected class.

## V

■■■ Our holding today does not permit states to avoid their legal duty to comply with the provisions of the FLSA. We do not strike as unconstitutional the substantive provisions of the FLSA as applied to the states, only that portion of the FLSA that purports to give federal courts jurisdiction over such actions in violation of the Eleventh Amendment. A state employee can still sue a state officer in federal court for an injunction ordering the officer to comply with the FLSA, as *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), cuts out a broad exception from the Eleventh Amendment bar for actions seeking injunctive relief from state officers. The federal government can bring suit in federal court for money damages under the FLSA *on behalf* of state employees, and may remit part or all of the damages to them. 29 U.S.C. § 216(c). Finally, state employees may sue in state court for money damages under the FLSA, and a state court would be obligated by the Supremacy Clause to enforce federal law.

## VI

■■■ There is no principled way to take this case out of the reach of *Seminole Tribe* and allow Congress to abrogate Ohio's Eleventh Amendment immunity. The plaintiffs are clearly "citizens" of a state, as contemplated by the current interpretation of the Eleventh Amendment. *See Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890) (Eleventh Amendment immunity applies to actions by citizens of a state suing that state for a violation of federal law). The defendants are the State of Ohio and officers of the State of Ohio sued in their official capacity. That part of the action against the State is barred directly by *Seminole Tribe.* That part of the action against the officers in their official capacity for money damages is also barred, as such an action is nothing but a suit to recover money damages from the state treasury. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The only remaining part of the plaintiffs' action is their request for an injunction to stop Ohio from "further violating [the plaintiffs'] rights under law" and their equitable plea for "other relief as may be just and proper." Complaint at 9–10. Since the district court awarded only money damages in the action below, any possible basis for the plaintiffs' action under *Ex Parte Young,* 209 U.S. at 123, 28 S.Ct. at 441, is irrelevant to their current appeal.

The judgment of the district court is VACATED and the case REMANDED for further proceedings in accordance with this opinion. On remand, the court should determine whether it has subject matter jurisdiction over any other part of the plaintiffs' action.